**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

**Case No. _____**

CHRISTINE GOODWIN and CHRISTINA T.
GELOSO, Individually and on Behalf of All
Others Similarly Situated,

      Plaintiffs,

      v.

JOHNSON & JOHNSON CONSUMER INC.;

      Defendant.

**CLASS ACTION COMPLAINT**

Plaintiffs Christine Goodwin and Christina T. Geloso ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Johnson & Johnson Consumer Inc. ("JJCI"), and in support thereof state as follows:

**NATURE OF THE ACTION**

1. This is a class action lawsuit brought by Plaintiffs and other similarly situated purchasers of certain sunscreen products manufactured, marketed, distributed, and sold by JJCI under the brand names "Aveeno" and "Neutrogena."[1]

2. Plaintiffs' allegations as set forth herein are based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein

---

[1] JJCI is the manufacturer and/or distributor of the Products, as defined herein, and as of 2015, has succeeded to all the debts and liabilities of the Neutrogena brand and the Products. On information and belief, JJCI is liable for all claims related to Products sold under the Aveeno brand.

1

after a reasonable opportunity for discovery.

3.      Recent independent scientific testing, confirmed by JJCI through a massive nationwide recall, has revealed that several of JJCI's Neutrogena and Aveeno sunscreen products contain dangerous and unacceptable levels of benzene, a known human carcinogen (hereinafter the "Products").

4.      Each and every one of the Products has been marketed and sold as "sunscreen" by JJCI through packaging and other advertising materials, as required by 21 C.F.R. § 201.327(b).

5.      Each and every one of the Products fails to include labeling indicating that the Products may contain benzene as an active or inactive ingredient.

6.      The presence of benzene has rendered the Products adulterated, misbranded, and unlawful for sale.  JJCI's conduct with respect to the Products has caused economic damages to Plaintiffs and the putative Class.  This suit is brought for injunctive relief; restitution of the full purchase price of the Products; and such other equitable or monetary relief as allowed by state and/or federal law.

7.      Benzene is a simple hydrocarbon, $C_6H_6$, often found in crude oil and most easily identified by the smell associated with gasoline.  It is used in industrial settings to make plastics, resins, synthetic fibers, and rubber lubricants, as well as dyes, detergents, drugs, and pesticides.

8.      Benzene is classified as a human carcinogen by the United States Department of Health and Health Services ("DHHS").  The World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have concluded that benzene is a Group 1 compound, *i.e.* it is "carcinogenic to humans."[2]

---

[2] International Agency for Research on Cancer and World Health Organization, *IARC Monographs on the Identification of Carcinogenic Hazards to Humans* (https://monographs.iarc.who.int/list-of-classifications).

9.      Scientific studies have established that exposure to benzene can cause leukemia, other blood and bone marrow disorders (including anemia), and a weakened immune system.  In addition, benzene has been linked to multiple myeloma and non-Hodgkin's lymphoma.

10.     The Food and Drug Administration ("FDA") classifies benzene as a Class 1 solvent, a group that encompasses materials that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or . . . deleterious environmental effect."[3]  In those limited cases where use of benzene is "unavoidable in order to produce a drug product with a significant therapeutic advance," the FDA has restricted levels to 2 parts per million ("ppm").  In all other cases, no level of benzene is acceptable.

11.     The FDA regulates sunscreens to ensure they meet safety and effectiveness standards.  All products that claim to provide Broad Spectrum Sun Protection Factor ("SPF") protection, including the Products, are regulated as over-the-counter drugs, rather than as cosmetics.  21 C.F.R. § 352, et seq.  The FDA requires sunscreen manufacturers to subject their products to certain testing before they are made available to any consumer.  The FDA has also identified those materials that qualify as acceptable active ingredients for products labeled as sunscreen.  Benzene is not one of those acceptable ingredients.

12.     The FDA's regulations provide that an "over-the-counter sunscreen drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets" certain conditions.  21 C.F.R. § 352.1(a).  Among other things, the product must contain "only suitable inactive ingredients which are safe in the amounts administered" and contains only listed active ingredients at levels "that do[] not exceed the amount reasonably required to achieve [their] intended effect."  21 C.F.R. § 330.1(h).

13.     Valisure is an independent pharmaceutical laboratory, registered with the FDA,

---

[3] Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017) (https://www.fda.gov/media/71737/download)

whose scientists analyze the safety of various consumer products.  Recently, Valisure conducted a study on the potential carcinogenicity of active ingredients in a variety of sunscreens and after sun products, including numerous products manufactured, marketed, and sold by JJCI.   These included:

- Ultra Sheer Weightless Sunscreen Spray, SPF 100+
- Ultra Sheer Weightless Sunscreen Spray, SPF 70
- Ultra Sheer Dry-Touch Water Resistant Sunscreen, SPF 70
- Ultra Sheer Body Mist Sunscreen Broad Spectrum, SPF 45
- Ultra Sheer Body Mist Sunscreen Broad Spectrum, SPF 30
- Invisible Daily Defense Body Sunscreen Broad Spectrum, SPF 60+
- CoolDry Sport Water-Resistant Sunscreen Spray, SPF 70
- CoolDry Sport Water-Resistant Sunscreen Spray, SPF 50
- Beach Defense Oil-Free Body Sunscreen Spray, SPF 100
- Beach Defense Spray Body Sunscreen, SPF 50

14.     During its study, Valisure detected high levels of benzene in several JJCI product batches.  In particular, Valisure identified benzene levels over 2 ppm in ten Neutrogena sunscreen batches from five separate products lines.  (See table below.)  It identified benzene levels of up to 2 ppm in thirteen Neutrogena sunscreen batches from ten different product lines.[4]

15.     By way of reference, the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by any worker expecting to be exposed to benzene at concentrations of 0.1 ppm for over 10 hours or 1 ppm for 15 minutes.[5]  NIOSH lists

---

[4] Should discovery reveal additional sunscreen products that are affected by this action and Plaintiff reserve their right to include additional sunscreen products manufactured, sold, and distributed by JJCI should discovery identify additional such products relevant to this action.

[5] Centers for Disease Control and Prevention.  The National Institute for Occupational Safety and Health,          BENZENE:          Systemic          Agent          (2011) https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750032.html).

"skin absorption" as one way a person could be exposed to dangerous levels of benzene.[6]

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 04820E04 | 2022-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 6.26 6.77* | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 07020E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.96 | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 06920E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.76 | 5% |
| Sun Bum | Gel | Cool Down Gel | N/A | 871760002005 | S0082C | – | N/A (Cosmetic Product) | 5.33 5.49* | 3% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 02320E01 | 2022-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.30 | 2% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 04721E02 | 2023-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 5.20 5.59* | 5% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 8140449A | – | N/A (Cosmetic Product) | 4.71 4.55* | 1% |
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ | 60+ | 086800111542 | 04921E01 | 2024-01 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 4.65 5.27* | 4% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 03120E02 | 2021-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.11 6.00** | 15% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 28020E01 | 2022-09 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.01 4.00* | 4% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 4111849A | – | N/A (Cosmetic Product) | 3.58 3.93* | 4% |
| Neutrogena | Spray | Beach Defense Spray Body Sunscreen SPF 50 | 50 | 086800112549 | 25520E01 | 2023-08 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 3.52 3.71* | 3% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 31420E04 | 2022-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 3.08 2.64* | 2% |
| Fruit of the Earth | Gel | Aloe Vera Gel | N/A | 071661001200 | 6612940A | – | N/A (Cosmetic Product) | 2.78 2.94* | 6% |

16.     Valisure determined that benzene is not unavoidably present in the sunscreen products.  Indeed, many of the sunscreens that Valisure tested contained no benzene.  Nor is benzene's presence in the products related to any known, let alone significant, therapeutic advance. Benzene is not a listed active or inactive ingredient on the label of any of the Products, and JJCI has never otherwise warned consumers that the Products may contain benzene.

17.     Products with avoidable levels of benzene do not "contain[] only suitable inactive ingredients which are safe in the amounts administered" or contain only listed active ingredients at levels "that do[] not exceed the amount reasonably required to achieve [their] intended effect." 21 C.F.R. § 330.1(e)(h).

18.     Accordingly, per FDA guidelines, any significant detection of benzene in the

---

[6] Centers for Disease Control and Prevention. The National Institute for Occupational Safety and Health (NIOSH), Benzene (October 30, 2019) (https://www.cdc.gov/niosh/npg/npgd0049.html).

Products should be deemed unacceptable.

19.     Valisure states that the presence of benzene in the Products may be the result of contamination.  Valisure does not identify how this contamination could have occurred, but its testing showed how readily detectable this dangerous contaminant is in the Products.

20.     As Valisure concluded, the presence of a known human carcinogen in the Products is especially troubling as the Products are "widely recommended for the prevention of skin cancer and regularly used by adults and children in large volumes."[7]  Because "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules," "even a relatively low concentration limit can result in very high total exposure."[8]  As one researcher and clinician from Yale University has explained, "Considering that human skin has a large total surface area ($\sim$1.85 m$^2$), and that $\sim$28.5 g of sunscreen is needed per application to properly cover that skin surface, it follows then that there is not a safe level of benzene that can exist in sunscreen products."[9]

21.     To put this figure in context, at the FDA conditional restriction limit of 2 ppm for benzene, 28.5 g of sunscreen would contain 57,000 ng of benzene in a single application which may reasonably be used 4 times per day, therefore amounting to 228,000 ng of benzene exposure per day.  Other comparable carcinogens, such as N-Nitrosodimethylamine ("NDMA"), have permissible daily intakes of around 96 ng.  This means a sunscreen with a benzene detection of 6.26 ppm, such as JJCI's Ultra Sheer Weightless Sunscreen Spray, SPF 100+, equates to approximately 695,800 ng of benzene in one day or *7,248 times the limit for comparable carcinogens*.

---

[7] Light, Kucera, and Wu, *Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products*, p. 2 (May 24, 2021).
[8] *Id*. at 16.
[9] Email from Dr. Christopher Bunick, MD, PhD, Associate Professor of Dermatology at Yale University, New Haven, CT to Valisure.

22.     On May 25, 2021, Valisure filed a citizen petition with the FDA, detailing its findings and asking the FDA to recall all batches of sunscreen products in which benzene was detected, including all batches of Neutrogena products containing the carcinogen.

23.     As Valisure explained in its petition, the presence of benzene in the Products renders them adulterated under Section 501[10] of the Federal Drug and Cosmetics Act ("FDCA") and misbranded under Section 502[11] of the FDCA, in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352, respectively.

24.     Federal law prohibits the manufacture, distribution, and receipt of any misbranded or adulterated drug.  *See* 21 U.S.C. § 331(a).  Nonetheless, JJCI waited nearly two months before removing the *some* of the Products from the market.  Despite announcing a nationwide recall of many aerosol Products on July 14, 2021,[12] as of the date of this filing, JJCI continues to market, sell, and profit from the Products using false and misleading statements regarding their safety.[13]

25.     Despite the Valisure petition's extensive reporting on the presence of benzene in its products, JJCI waited nearly two months to recall *any* of the Products or warn members of the public of the risks to their health or safety.

26.     When JJCI finally did announce the presence of benzene in the Products, it also revealed that not only had Neutrogena products been adulterated and mislabeled, but that the

---

[10] Section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act provides that a drug (including a drug contained in a medicated feed) shall be deemed to be adulterated if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirement of the act as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess.

[11] Section 502(a) declares that a drug or device is misbranded if its labeling proves false or misleading in any particular.

[12] https://www.neutrogena.com/sunscreen-recall.html

[13] To date, JJCI has made no recall of Ultra Sheer Dry-Touch Water Resistant Sunscreen SPF 70 or SPF 100.

benzene was also present in at least the Aveeno brand Protect + Refresh aerosol sunscreen product line.

27.     To date, JJCI has not explained why or how benzene is present in the Products, or whether JJCI conducted testing that could and should have detected benzene.

28.     The revelation that the Products contain unacceptable levels of benzene, and are therefore adulterated and misbranded, stands in stark contrast to JJCI's long-standing branding, marketing, and advertising strategy for Neutrogena and Aveeno products, including its sunscreen. That strategy revolves around convincing consumers that the Products are safe and healthy.

29.     The packaging for the Products, as well Neutrogena's website, have long represented to consumers that the Products are "#1 Dermatologist Recommended."[14]   The basis for this representation, which clearly aims to portray the product as safe and healthy, is nowhere specified on either the Products packaging or website.  And the representation remains unchanged even in the wake of Valisure's discovery and citizen's petition.  Nowhere do Defendants explain if or how dermatologists recommended the Products with knowledge that they contain benzene. However, the Neutrogena website acknowledges that "[t]he strong relationship between Neutrogena® Corporation and dermatologists gave the company an exceptional competitive advantage."[15]

---

[14] https://www.neutrogena.com/the-bar/why neutrogena.html?q=dermatologist%20recommended (last visited July 9, 2021)
[15] *Id.* (last visited July 9, 2021).





9





30.     Neutrogena also makes a point of associating the word "clean" with its Ultra Sheer product line, repeatedly noting in both its packaging and advertising that the product is "clean."

Ironically, in Valisure's testing, Neutrogena's Ultra Sheer products held four of the top five spots in benzene ppm.



31.     The packaging for the Aveeno Products, meanwhile, represents to consumers that the Aveeno Products have been "Dermatologist recommended for over 65 years."   The representation remains unchanged even in the wake of Aveeno's recall.   Nowhere does JJCI explain if or how dermatologists recommend the Products with knowledge that they contain benzene.



32.     JJCI's efforts to portray its sunscreens as clean and doctor approved extends to its commercials as well.  For example, commercials for Neutrogena Ultra Sheer, starring actress Jennifer Garner, prominently display the representation, "#1 Dermatologist Recommended Suncare."[16]  In these commercials, Ms. Garner emphasizes the "clean" feel of the product and deems it "the best for your skin."[17]

---

[16] *Neutrogena Ultra Sheer Dry Touch TV Commercial Featuring Jennifer Garner* https://www.ispot.tv/ad/7ZH8/neutrogena-ultra-sheer-dry-touch-featuring-jennifer-garner   (last visited July 13, 2021).
[17]   GRANDLARGETV, *Neutrogena w/Jennifer Garner*, YOUTUBE (Feb. 23, 2017) https://www.youtube.com/watch?v=K55T4vbJa6Y

33.     Another commercial, advertising the Neutrogena Beach Defense line, features children playing on a beach and happily being sprayed with Neutrogena sunscreen.  The commercial emphasizes that the product is the "sun care brand used most by dermatologists and their families."  Smiling children appear as the word "families" is heard.[18]

34.     Neutrogena also touts itself as "[l]eading the way" in product testing.  The company's website has an entire page dedicated to its supposedly high product-testing standards; among other claims, Neutrogena purports to "not only follow individual country regulations, but also look to incorporate the best thinking and practices from top authorities for skincare products around the world."  The webpage goes on to explain that the company "set[s] a high bar for using ingredients.  Our ingredients are screened for quality, manufacturing process, government regulations, published research, and our own ingredient safety databases."  The company also makes specific claims about it manufacturing process, emphasizing that "[s]afety goes beyond the ingredients list," with attention also paid to "how our ingredients are used, our manufacturing safeguards, how the products are used, and testing requirements for our products."[19]

35.     Neutrogena's product testing webpage links to another JJCI webpage regarding the company's safety and care commitment.  This webpage notes that, "Your safety is our priority.  That's why our safety assessment process meets or exceeds industry and regulatory standards for baby and beauty personal care products.  It's a process that never ends–we continually review our product ingredients against the latest research and consumer feedback.  We believe our process is among the most rigorous in the world and is at the core of our Safety & Care Commitment."[20]  The webpage goes on to state that, "Our Safety & Care Commitment means that every product is

---

[18]  *Neutrogena Beach Defense TV Commercial, 'More Protection. More Sun.'*, https://www.ispot.tv/ad/OBGJ/neutrogena-beach-defense-more-protection-more-sun (last visited July 13, 2021).

[19] *Neutrogena Product Testing*, https://www.neutrogena.com/producttesting.html (last visited July 13, 2021).

[20] *Commitment*, https://safetyandcarecommitment.com/commitment (last visited July 13, 2021).

carefully reviewed and evaluated against internationally recognized standards." The webpage then reiterates the tenants of product testing that appear on the Neutrogena website.[21]

36.    Aveeno's website likewise aggressively markets its products as contributing to consumers' health and emphasizes that its products are comprised of ingredients from nature. Aveeno's "About Aveeno" webpage is replete with claims about the safety and supposedly "natural" origins of its ingredients. For example, the webpage states "Healthy Skin, Naturally: Nature fuels our healthy spirit, just like healthy skin fuels yours. We research and work with scientists and dermatologists around the world to unlock the therapeutic power of nature's most restorative ingredients, giving you clinically-proven products that nurture and care for your skin, so you can care for what's most important in life." The webpage goes on to explain that the company was started based on two brothers' belief that "nature holds the secret to human health" and notes that since the creation of the brand, it has "published 70 years of clinical evidence supporting the benefits of not just oat, but other natural ingredients." Under the section about Aveeno's supposed "Commitment to Wellness," the company notes when it comes to its ingredients "'Good enough' is never good enough for Aveeno®. Our internal standards for safety testing and ingredient quality far exceed those set by regulators around the world. . . . We think about every element we use in every one of our products—where it came from, what it does and how it impacts you and your skin. Only ingredients that pass our strict 5-step safety assurance process are used."[22]

37.    On Aveeno's webpage dedicated to sun products, the company goes even further to advertise its products as safe and healthy. The webpage notes, "Soak Up The Sun Worry Free: The best sun care leaves you feeling carefree. Aveeno's powerful and hydrating sun protection with broad spectrum SPF keeps your skin safe and healthy so you can enjoy sunny moments

---

[21] *Id.*
[22] About Aveeno, https://www.aveeno.com/about (last visited July 14, 2021).

without a single worry."[23]

38.     Representations made on JJCI's Neutrogena and Aveeno websites remain today, despite the recall of their products, making no mention of Valisure's findings.   These representations do not, and upon information and belief have never, explained whether or not JJCI itself bothered to test its products for benzene and, if such testing did actually occur, what the results were.

39.     In addition, the website for JJCI's corporate parent, Johnson & Johnson, continues to promote a wide variety of articles claiming that chemical sunscreens, like the Products, are safe. For example, one webpage titled "The Science of Sunscreen: 3 Experts Tackle Common Myths About Its Safety" notes that both mineral and chemical sunscreens "are considered safe and effective, and have been used by consumers for decades."  The article quotes a Dr. Joshua Zeichner as stating "[d]espite anecdotal reports questioning the safety of the ingredients in sunscreen, there is no data that shows there is any harm to your health by using it."  The article also notes a 2011 review of sunscreen ingredients, which "found that none were shown to have toxicity in humans."[24]  The referenced article, "Current Sunscreen Controversies: A Critical Review" by Mark Burnett and Steven Wang, unsurprisingly did not examine the toxicity of benzene.

40.     Other articles on the Johnson & Johnson website tout Neutrogena's products as essential to health, including, ironically, cancer prevention.  For example, one article titled "8 Things We Learned From the New Neutrogena Documentary In the Sun," notes that

_____

[23] https://www.aveeno.com/sun

[24] Sunny Sea Gold, *The Science of Sunscreen: 3 Experts Tackle Common Myths About Its Safety*, (May 20, 2019), https://www.jnj.com/health-and-wellness/sunscreen-safety-myths-experts-tackle-the-science-of-sun-protection; *see also* Krista Bennett DeMaio, *5 Things We Now Know About the Safety and Effectiveness of Sunscreen*, (May 23, 2017), https://www.jnj.com/health-and-wellness/5-things-we-now-know-about-safety-and-effectiveness-of-sunscreen (noting that "[s]unscreen is . . . safe to use" and that "[w]e've been using some of the[] ingredients [in sunscreen] for 30 years with a proven safety record—and there's much more evidence of benefit than harm")

"[p]revention [of melanoma] starts with sunscreen."[25]  Another article titled "The ABCs and 123s of Smart Summer Skin Care," encourages readers to share the provided sunscreen facts and "have a safe, healthy summer!"[26]

41.     Neutrogena even created the "Choose Skin Health Movement," which was purportedly designed to "change the future of skin health and reduce the risk of skin cancer through education, empowerment, and early detection."[27]  Several celebrities filmed spots for the campaign, including Jennifer Garner, Kristen Bell, and Kerry Washington.  In the kick-off video for the campaign, Ms. Garner emphasized the statistics on skin cancer and ended by stating that she chooses Neutrogena suncare because "[she] choose[s] skin health."[28]  In another such video, Garner states that she "wears Neutrogena Ultra Sheer 45 every day because" she chooses "skin health."[29]  This sunscreen is from the same product line as many of the products Valisure revealed to be contaminated.  In yet another video, Ms. Washington advises viewers to "[p]rotect yourself and those you love.  Choose skin health for a lifetime of healthy skin."[30]

---

[25] Krista Bennett DeMaio, *8 Things We Learned From the New Neutrogena Documentary In the Sun,* (May 18, 2021), https://www.jnj.com/health-and-wellness/sun-safety-facts-from-neutrogena-documentary-in-the-sun

[26] *The ABCs and 123s of Smart Summer Skin Care*, (June 15, 2016), https://www.jnj.com/health-and-wellness/the-abcs-and-123s-of-smart-summer-skin-care.   And the sunscreen-safety related articles do not stop there.  *See, e.g.,* Elizabeth Marglin, *6 Summer Sun Safety Tips From Seasoned Moms,* (June 7. 2017), https://www.jnj.com/health-and-wellness/6-summer-sun-safety-tips-from-seasoned-moms; Gigi Ross, *Being Sun Smart for UV Safety Month*, (July 19, 2013), https://www.jnj.com/our-company/being-sun-smart-for-uv-safety-month.

[27] Neutrogena is kicking off its 2016 Choose Skin Health Campaign, HAPPI (July 1, 2016), https://www.happi.com/issues/2016-07-01/view_breaking-news/neutrogena-is-kicking-off-its-2016-choose-skin-health-campaign/

[28] Neutrogena, Jennifer Garner Shares Why You Should Join the #ChooseSkinHealth Movement, YOUTUBE (May 21, 2014), https://www.youtube.com/watch?v=l1ep2dy4tS4&list=PLPA6DFZGPXhk7_EodvLLFRZRJK-mTwojI&index=14

[29] Neutrogena, Jennifer Garner Shares Her Daily Sunscreen, YOUTUBE (May 22, 2014), https://www.youtube.com/watch?v=38AIdCY1evQ

[30] Neutrogena, Kerry Washington Gets Personal About Her Skin Health, YOUTUBE (July 22, 2015),

42.     JJCI's failure to prevent the presence of benzene in the Products, and its continued sale of these dangerous and illegal products, constitutes actionable fraud.  As of the date of this filing, JJCI continues to mislead and defraud consumers by making affirmative misrepresentations that portray the product as safe, and omitting from the Products' packaging and marketing materials information about the actual danger of the Products, including any warning to consumers that the Products may contain unacceptable levels of benzene rendering them adulterated, misbranded and illegal.

43.     Because benzene is not a necessary ingredient in the Products—and if it were, concentrations above 2 ppm are entirely prohibited by federal law—the Products are illegal and unfit for sale in trade or commerce.  This prohibition on any sale of the Products whatsoever renders the adulterated, misbranded, and unlawfully sold Products legally worthless.  If the Products had been truthfully and accurately labeled, no consumer would have purchased the Products.  Accordingly, Plaintiff and the Classes were injured by the full purchase price of the Products.

44.     Plaintiff and the Classes paid for suncare products free of carcinogens.  Because JJCI sold them products that may contain dangerous levels of benzene, Plaintiff and the Classes were deprived of the benefit of their bargain.

45.     The Plaintiffs and the Classes are further entitled to damages for the injury sustained in being exposed to high levels of acutely toxic benzene, damages related to JJCI's conduct, and injunctive relief.

### PARTIES

46.     Christine Goodwin ("Goodwin") resides in Pompano Beach, Florida, and at all

---

https://www.youtube.com/watch?v=HokEk_1hwKI&list=PLPA6DFZGPXhk7_EodvLLFRZRJK-mTwojI

times relevant hereto, has been a resident of Broward County, Florida.

47.     Plaintiff Goodwin has purchased Neutrogena Ultra Sheer Body Mist Sunscreen Spray, SPF 45; Neutrogena Beach Defense Sunscreen Spray, SPFs 50 and 70; and Neutrogena Ultra Sheer Dry-Touch Water Resistant Sunscreen, SPF 100 during the relevant class period. When purchasing the Products, Plaintiff Goodwin reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer, distributor, and pharmacy that the Product was properly manufactured, free from defects, and safe for its intended use.  Plaintiff Goodwin relied on these representations and warranties in deciding to purchase the Products manufactured by JJCI, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Products from JJCI if she had known that they were not, in fact, properly manufactured free from defects, unadulterated, and properly labeled.  As a result, Plaintiff suffered injury in fact when she purchased and used the aforementioned Products, which she would not have purchased and used absent Defendant's misconduct as alleged herein.

48.     Plaintiff Christina T. Geloso ("Geloso") resides in Coral Springs, Florida, and at all times relevant hereto, has been a resident of Broward County, Florida.

49.     Plaintiff Geloso has purchased Neutrogena Ultra Sheer Body Mist Sunscreen Spray, SPF 100; Neutrogena Beach Defense Sunscreen Spray, SPF 100; and Neutrogena Cool Dry Sport Sunscreen Spray, SPFs 50 and 100 during the relevant class period.  When purchasing the Products, Plaintiff Geloso reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer, distributor, and pharmacy that the Product was properly manufactured, free from defects, and safe for its intended use.  Plaintiff Geloso relied on these representations and warranties in deciding to purchase the Products manufactured by JJCI, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Products from JJCI if she had known that they were not, in fact, properly

18

manufactured free from defects, unadulterated, and properly labeled.  As a result, Plaintiff suffered injury in fact when she purchased and used the aforementioned Products, which she would not have purchased and used absent Defendant's misconduct as alleged herein.

50.     Plaintiffs have standing to represent members of the Classes because there is sufficient similarity between the specific Products purchased by the Plaintiffs and the other Products purchased by the Classes.  Specifically, each and every one of the Products are marketed and labeled in the same way—as "sunscreen"—and fail to indicate to consumers that the Products may contain benzene as an active or inactive ingredient; accordingly, all members of the Classes were injured in substantially the same manner.

51.     Defendant Johnson & Johnson Consumer Inc. is a New Jersey corporation with its headquarters at Grandview Road, Skillman, New Jersey, 08558.  JJCI is a subsidiary of the Johnson & Johnson conglomerate.  JJCI is the manufacturer and/or distributor of the Products, and as of 2015, has succeeded to all the debts and liabilities of the Neutrogena brand and the Products. On information and belief, JJCI is liable for all claims related to Aveeno branded Products.

## JURISDICTION & VENUE

52.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than JJCI, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

53.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because substantial acts in furtherance of the alleged improper conduct, including the dissemination of deceptive information regarding the benefits of the Products occurred within this District.  Venue is also proper under 18 U.S.C. § 1965(a) because JJCI transacts substantial business in this District.

54.     This Court has jurisdiction over JJCI because JJCI is authorized to conduct and do business in Florida.   JJCI has marketed, promoted, distributed, and sold sunscreen protection products, including the Products, in Florida. JJCI has established sufficient minimum contacts with this State by having availed itself of the markets in this State through its promotion, sales, distribution and marketing of its sunscreen protection products, such that the exercise of jurisdiction by this Court is permissible.  A substantial portion of all claims alleged on behalf of Plaintiffs and the Classes arise out of conduct occurring in the State of Florida.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action on behalf of themselves and all other similarly situated class members (the "Class") pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following class(es) against Defendant for violations of Florida state laws and/or similar laws in other states:

> The Nationwide Subclass
> All consumers who purchased any lotion or spray Product in the United States for personal use or consumption.
> The Florida Subclass
> All consumers who purchased any lotion or spray Product in the State of Florida for personal use or consumption.

56.     Excluded from each Class are individuals who allege personal bodily injury resulting from the use of Products.  Also excluded from each Class are JJCI, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

57.     **Numerosity**: Plaintiffs do not know the exact size of each Class, but given the nature of the claims and JJCI's sales of the Products across Florida, and the United States, Plaintiffs believe that each of the Subclasses is so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Subclasses each contain tens of thousands of purchasers of JJCI's Products who have been damaged by JJCI's conduct as alleged herein.

58.    **Typicality**.  Plaintiffs' claims are typical to those of all Class members because members of each Class have been similarly injured through JJCI's uniform misconduct described above and were subject to JJCI's deceptive sunscreen claims that accompanied each and every sunscreen product in the Neutrogena and Aveeno collections.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of each Class.  Specifically, each and every one of JJCI's Products fails to include labeling indicating to consumers that the Products may contain benzene as an active or inactive ingredient.  Accordingly, the misleading effect of all of the Products are substantially the same, and Plaintiffs' claims are typical for the Classes.

59.    **Common Questions of Law and Fact**.  Plaintiffs' claims raise questions of law and fact common to all members of each Class, and they predominate over any questions affecting only individual Class members.  The claims of Plaintiffs and all prospective Class members involve the same alleged defect.  These common legal and factual questions include the following:

60.    whether JJCI's Products contained benzene;

61.    whether JJCI's representations and omissions, seen in their marketing, advertising, packaging, labeling, and other promotional materials, are true, or are misleading, or objectively reasonably likely to deceive;

62.    whether the alleged conduct constitutes violations of the laws asserted;

63.    whether JJCI's alleged conduct violates public policy;

64.    whether JJCI engaged in false or misleading advertising;

65.    whether JJCI's manufacturing, marketing, promotion, distributing, and selling of the Products violates Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-213;

66.     whether JJCI is liable to Plaintiffs and the Classes for unjust enrichment;

67.     whether Plaintiffs and members of the Classes are entitled to damages and/or restitution and the proper measure of that loss; and,

68.     whether Plaintiffs and the members of the Classes are entitled to declaratory and injunctive relief.

69.     **Adequacy of Representation**.  Plaintiffs will fairly and adequately protect and represent the interests of each Class.  Plaintiffs have retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.  Plaintiffs have no interests that are adverse or antagonistic to those of the Classes.

70.     **Superiority**.  A class action is superior to the other available methods for a fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by the Plaintiffs and individual Class members is relatively small compared to the burden and expense of individual litigation of their claims against JJCI.  It would thus be virtually impossible for Plaintiffs and the other Class members, on an individual basis, to obtain effective redress for the wrongs done to them.  Further, it is desirable to concentrate the litigation of the members' claims for each Class in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications.  Plaintiffs know of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

71.     Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent JJCI from engaging in the acts described above, such as continuing to market and sell the Products that may be adulterated with benzene, and requiring JJCI to provide a full refund of the purchase price of the Products to Plaintiffs and Class members.

72.     Unless the Classes are certified, JJCI will retain monies received as a result of its conduct that were taken from Plaintiffs and the members of each Class.  Unless a class-wide injunction is issued, JJCI will continue to commit the violations alleged and both the Classes and general public will continue to be misled.

## **FIRST CAUSE OF ACTION**

### **Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-213 (On Behalf of the Nationwide Subclass and Florida Subclass)**

73.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

74.     Plaintiffs bring this claim individually and on behalf of the Class.

75.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Fla. Stat. § 501.204.

76.     Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

77.     As alleged herein, Plaintiffs have suffered injury in fact and lost money as a result of Defendant's conduct because they purchased the Products from Defendant in reliance on Defendant's representation that the ingredients in the Products were safe and effective and were not adulterated with benzene, a known human carcinogen.

78.     As alleged herein, Defendant's actions are deceptive and in clear violation of FDUTPA, entitling Plaintiffs and the Class to damages and relief under Fla. Stat. §§ 501.201-213.

79.     Defendant has engaged, and continues to engage, in conduct that is likely to deceive

members of the public.  This conduct includes representing in its labels that the Products contain only the ingredients listed in the label, which is untrue, and failing to make any mention that the Products are adulterated with benzene, a known human carcinogen.

80.     Similarly, Defendant has engaged, and continues to engage, in deceptive, untrue, and misleading advertising by "promising" to consumers, among other things, (i) that Defendant uses "carefully selected ingredients,"[31] (ii) that "safety is paramount,"[32] (iii) that they "avoid unnecessary and harsh ingredients,"[33] and (iv) that "the sunscreen ingredients we use are safe and effective . . . "[34] when in fact the Products do contain a known (but undisclosed)  human carcinogen (i.e. benzene).  The following image shows an example of such deceptive advertising:



*Carefully Selected Ingredients*

*At Neutrogena®, safety is paramount. What we include in our products is just as important as what we exclude from them. We strive to avoid unnecessary and harsh ingredients and we prioritize ingredients that are not only safe for your skin, but also*

---

[31] https://www.neutrogena.com/our-promise.html.

[32] https://www.neutrogena.com/our-promise.html.

[33] https://www.neutrogena.com/our-promise.html.

[34]https://www.neutrogenamd.com/sites/neutrogenahcp_us/files/20190416-fda-proposal-guide3b.cocoon.pdf

> *safe for the planet, throughout the lifecycle of our products. We are committed to ingredient transparency so you can make informed decisions for your skin health.*

81.     By committing the acts alleged above, Defendant has engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.[35]

82.     Defendant's conduct is substantially injurious to consumers.  Consumers are purchasing and, as instructed in the label, "apply[ing] liberally" the Products without knowledge that there is a risk the Products may be adulterated with a human carcinogen.  This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for sunscreens potentially adulterated with benzene but for Defendant's false labeling, advertising, and promotion.  Thus, Plaintiffs and the putative Class have been "aggrieved" (i.e. lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

83.     Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's representation of the ingredients contained in the Products' labels and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

84.     Further, Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.  Plaintiffs are long-time users of Defendant's sunscreen products, and they desire to purchase Defendant's products in the future if they can be assured that those products are unadulterated and meet the advertising claims.  Absent injunctive relief, Defendant may continue to advertise, promote and sell the adulterated Products that deceive the public as to their ingredients and safety.  Plaintiffs are thus likely to again be wronged in a similar way.  For

---

[35] Defendant's conduct violates Section 5 of the Federal Trade Commission "("FTC") Act, 15 U.S.C. § 45, which prohibits unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.

example, if Plaintiffs encounter Defendant's sunscreen products in the future and there is a risk those products still contain benzene, Plaintiffs may mistakenly rely on the product's label and believe that Defendant eliminated benzene when it did not.

85.     Section 501.204 of FDUTPA makes unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

86.     Section 501.211 of FDUTPA creates a private right of action for individuals who are aggrieved by an unfair and/or deceptive trade practice by another person.

87.     Section 501.2105 of FDUTPA provides that the prevailing party in litigation arising from a cause of action pursuant to Chapter 501 shall be entitled to recover attorney's fees within the limitations set forth therein from the non-prevailing party.

88.     Section 501.213 of FDUTPA, provides that any remedies available under Chapter 501 are in addition to any other remedies otherwise available for the same conduct under state or local law.

89.     Section 501.203(3)(c) of FDUTPA states that a person has violated the FDUTPA if he violates "any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices."

90.     Defendant is engaged in the practice of manufacturing, marketing, distributing, selling and otherwise placing into the stream of commerce the Products, which constitutes trade and commerce as defined by Fla. Stat. § 501.203(8), and is therefore subject to FDUPTA.

91.     As a result of Defendant's unfair and deceptive trade practices, Plaintiffs and the putative Class are entitled to an award of attorney's fees pursuant to FDUTPA, Fla. Stat. § 501.2105, if they prevail.

92.     Wherefore, Plaintiffs pray for judgement against Defendant, as set forth hereafter.

Defendant's conduct with respect to the labeling, advertising, marketing, and sale of the Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers; and, the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

93.     In accordance with FDUTPA,[36] Plaintiffs seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.  Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

94.     On behalf of Plaintiffs and the putative Class, Plaintiffs also seek an order entitling them to recover all monies spent on the Products, which were acquired through acts of fraudulent, unfair, or unlawful competition.[37]  In addition, the measure of restitution should be full refund of the purchase price insofar as the Products and their associated labels are worthless.  But for Defendant's misrepresentations and omissions, Plaintiffs would have paid nothing for the Products that have a risk of containing a known human carcinogen (i.e. benzene).  Indeed, there is no discernible "market" for an over-the-counter sunscreen product that may be adulterated with a known human carcinogen.  As recognized by the WHO, "[b]enzene is carcinogenic to humans, and no safe level of benzene can be recommended."[38]  As a result, the Products are rendered valueless.

95.     Wherefore, the Plaintiffs and members of the Class are entitled to both injunctive and equitable relief, and a full refund in the amount they spent on the Products.

---

[36] Section 501.211(1) allows "anyone aggrieved by a violation of" FDUTPA to seek declaratory or injunctive relief. Fla. Stat. §501.211.
[37] Section 501.211(2) provides that "a person who has suffered a loss as a result of a [FDUTPA] violation ... may recover actual damages. . ."
[38] https://www.who.int/ipcs/features/benzene.pdf.

## SECOND CAUSE OF ACTION

## Unjust Enrichment

### (On Behalf of the Nationwide Subclass and Florida Subclass)

96.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

97.     As a result of Defendant's wrongful and deceptive conduct alleged herein, Defendant knowingly and voluntarily accepted and retained wrongful benefits in the form of money paid by the Plaintiffs and members of the Class when they purchased the Products.

98.     In so doing, Defendant acted with conscious disregard for the rights of the Plaintiffs and members of the Class.

99.     As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

100.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

101.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from the false and deceptive labeling and marketing of the Products to the Plaintiffs and members of the Class.

102.    Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

103.    The financial benefits derived by Defendant rightfully belong to the Plaintiffs and members of the Class.

104.    Defendant should be compelled to disgorge in a common fund for the benefit of the

Plaintiffs and members of the Class all wrongful or inequitable proceeds received by Defendant.

105.    Finally, the Plaintiffs and members of the Class may assert an unjust enrichment claim even though a remedy at law may otherwise exist.[39]

### PRAYER FOR RELIEF

106.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendant to bear the costs of class notice;

107.    An order enjoining Defendant from selling the Products;

108.    An order enjoining Defendant from suggesting or implying that the Products are safe and effective for human application;

109.    An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing Products;

110.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

111.    An order requiring Defendant to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the FDUTPA,

---

[39] See State Farm Mut. Auto Ins. Co. v. Physicians Injury Care Ctr., 427 F. App'x 714, 722 (11th Cir. 2011), rev'd on other grounds, 824 F.3d 1311 (The general rule that "equitable remedies are not available under Florida law when adequate legal remedies exist . . . does not apply to unjust enrichment claims."); see also Morris v. ADT Sec. Servs., 580 F. Supp. 2d 1305, 1312-13 (S.D. Fla. 2008); In re Monat Care Hair Prods. Mktg., Sales Practices, and Prods. Liab. Litig., MDL No. 2841, 2019 WL 5423457, at *5 (S.D. Fla. Oct. 23, 2019); Garcia v. Clarins USA, Inc., No. 14-CV-212492014 WL 11997812, at *5 (S.D. Fla. Sept. 5, 2014); Goldberg v. Chong, 2007 WL 2028792 at *9 (S.D. Fla. July 11, 2007).

plus pre- and post-judgment interest thereon;

112.   An order requiring Defendant to disgorge any ill-gotten benefits received from the Plaintiffs and members of the Class as a result of any wrongful or unlawful act or practice;

113.   An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

114.   An order awarding attorneys' fees and costs to Plaintiffs and the Class; and

115.   An order providing for all other such legal or equitable relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 8, 2021

By: *Chris Glover*
  Chris Glover (FL Bar # 0799041)
   chris.glover@beasleyallen.com
  David B. Byrne III (*pro hac vice forthcoming*)
   david.byrne@beasleyallen.com
  BEASLEY, ALLEN, CROW, METHVIN,
  PORTIS & MILES, P.C.
  218 Commerce Street
  Montgomery, Alabama 36104
  Telephone: (334) 269-2343

  Seth Meyer (*pro hac vice forthcoming*)
   sam@kellerlenkner.com
  Alex Dravillas (*pro hac vice forthcoming*)
   ajd@kellerlenkner.com
  KELLER LENKNER LLC
  150 N. Riverside Plaza, Suite 4270
  Chicago, Illinois 60606
  Telephone: (312) 741-5220
  Fax: (312) 971-3502

Warren Postman (*pro hac vice forthcoming*)
  wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
Telephone: (202) 918-1123
Fax: (312) 971-3502

Alexandra Walsh (*pro hac vice forthcoming*)
  awalsh@alexwalshlaw.com
WALSH LAW PLLC
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
Telephone: (213) 863-4276
Fax: (202) 780-3678

Kimberly Channick (*pro hac vice forthcoming*)
  kchannick@alexwalshlaw.com
WALSH LAW PLLC
13428 Maxella Avenue, #203
Marina del Rey, CA 90292

*Attorneys for Plaintiffs*